Van Rensselaer and others, *appellants*, and Akin and others, *respondents.*

The *release* of lands by *one* of two *trustees*, from the operation of a mortgage, is not *in itself* sufficient to discharge the lands; to render it available, it must be executed by *both* trustees.

If, however, such release be treated as a valid instrument by an *assignee* of the trustees, all persons deriving title from such assignee are estopped from questioning its validity.

*Judicial proceedings* may be given in evidence as *circumstances* from which to infer a given consequence, without that concurrence as to *identity of parties* and of *subject matter* which works a technical bar.

Appeal from chancery.   This was a bill to foreclose three mortgages executed by the respondent and two other persons.  On the 10th March, 1810, the defendant *William Akin,* together with *Titus Goodman* and *John Dickinson,* became the purchasers of a tract of 537 acres of land, situate at *Green Bush* opposite the city of Albany, for which they agreed to pay $60,000 in manner following: *Each* purchaser to give his notes for $5000 payable at certain days, and also to give three several bonds for $5000 each payable as follows : $5000 on 1st May, 1811, $5000 on 1st May, 1812, and $5000 on 1st May, 1813.  The three bonds of $5000 each, *payable in* 1811, executed by the three purchasers, separately, to be secured by a *joint mortgage* executed by the three purchasers upon *a portion* of the land purchased.  The three bonds payable in 1812, to be secured in like manner by a *joint mortgage* upon *another portion* of the land, and the three bonds payable in 1813 to be secured in like manner, by a *joint mortgage* upon a *third portion* of the land sold.  The contract for the purchase was made with *Stephen N. Bayard,* and *Stephen Van Rensselaer,* to whom the above tract with other property was conveyed by *John J. Van Rensselaer* in trust for the benefit of his creditors, for the support of his family and the out fit of his children.  The trustees accordingly conveyed to the purchasers and the securities for the payment of the purchase money were executed.  On the 20th April, 1811, the purchasers made *partition* of the tract, and duly executed re-

Van Rensselaer v. Akin.

leases to each other. The three notes of $5000 each, as also the three bonds of $5000 each, *payable on the first day of May*, 1811, were duly paid: and subsequently *William Akin* paid the remaining two bonds of $5000 each *executed by him*, and on the 10th April, 1815, obtained a *release* from *Bayard* one of the trustees, (*Van Rensselear*, the other trustee refusing to execute it,) exonerating his portion of the premises from all liability on account of the mortgages. On the 17th October, 1812, the trustees of John J. Van Rensselaer gave up the *bonds* executed by *Dickinson* one of the purchasers, for the $10,000 due from him, and accepted in lieu thereof the bond of a person of the name of *Marshall Jones*. On the 1st February, 1816, the trustees assigned the three mortgages and the bonds of *Goodman* one of the original purchasers and of *Jones*, the substitute of *Dickinson*, to *Elias Boudinott*, for the alleged consideration of $22,000, and on the 11th July, 1818, *Boudinott* filed a bill in chancery for the foreclosure of the mortgages, to which bill he made *Goodman, Dickinson, Jones* and some subsequent purchasers parties, *but did not make William Akin a party*. In this bill the complainant set forth the *partition* made by the original purchasers, and admitted *that Akin had paid and satisfied the three bonds executed by him*, but alleged that there was a large arrear of principal and interest due and owing on the mortgages from *Goodman* and *Dickinson*. The defendants suffered the bill to be taken *pro confesso*, and previous to the 1st November, 1819, the whole of the premises contained in the mortgages, except that portion which on partition had been allotted to *Akin*, and also excepting some lots which had been *released* by the trustees, were sold at public auction, and with the exception of two small lots which brought $471, on the bid of others, was bought in by *Boudinott* for the sum of $8,309,44. The whole amount due on the bonds of *Goodman* and *Jones*, having been certified by a master at $25,176,86. The premises thus purchased by *Boudinott*, were subsequently conveyed to the trustees of John J. Van Rensselaer on the re-payment of the moneys advanced by Boudinott on receiving the assignment of the bonds and mort-

Van Rensselaer v. Akin.

gages; and on the 22d February, 1834, the three mort-
gages executed by Akin, Goodman and Dickinson, were
assigned by the surviving devisees in trust of Boudinott, to
the children of John J. Van Rensselaer, he having died.
The above facts relative to the transfer of the mortgages
and bonds to Boudinott, the bill to foreclose, and the pro-
ceedings had thereupon, were set forth in the answer of
*Akin* in the present suit.   He also set forth in his answer,
that on the 5th June, 1824, the present complainants, the
children of John J. Van Rensselaer, filed a bill in chancery, call-
ing *Stepen N. Bayard*, one of the trustees, to account, in
which they alleged that he had taken upon himself the prin-
cipal and almost *sole management and execution of the trusts*
created by the deed of their father, and charge him with
having released from the effect and operation of the mortga-
ges, divers portions of the land, and thereby weakened the se-
curities ; and he further alleged that the estate of Bayard (he
having died) had been decreed to account for the value of
the bonds of *Goodman* and *Jones*, over and above the value
of the lands securing the same.

On the first day of March, 1834 the respondents, the
children of John J. Van Rensselaer, filed their bill against the
*appellant*, and *Goodman, Dickinson* and *Jones*, for the fore-
closure of the three mortgages executed by them on 10th
March, 1810, alleging a large sum of money to be due upon
them ; they further alleged that *Bayard* died in 1831, and
that the surviving trustee Stephen Van Rensselaer, had as-
signed and transferred to them all the property and effects
of their father remaining in his hands as trustee, among
which were the mortgages sought to be foreclosed ; *but this
allegation was not proved.*   The proceedings in the *suit in
chancery* prosecuted by *Boudinott*, and in the suit prosecu-
ted by the complainants *against Bayard*, were received in
evidence before the chancellor subject to exception.   The
bill was taken as *pro confesso* against all the defendants ex-
cept *Akin*, as to whom the cause was heard on pleadings
and proofs, and on 28th Janury, 1839, the chancellor dis-
missed the bill as to him.   Whereupon the complainants
appealed to this court.   The cause was argued here by

Van Rensselaer v. Akin.

*J. Blunt & D. B. Ogden*, for the appellants.

*J. Rhoades & S. Stevens*, for the respondents.

After advisement, the following opinion was delivered :—

By COWEN, J.   I entirely concur in the chancellor's general conclusion.   Independent of the more technical inquiry, whether the proofs sustain the title insisted on by the bill, or, indeed, make out any title whatever in the appellants, the bill was properly dismissed, as to *Akin*, on the merits. Each purchaser was treated from the beginning as the sole principal debtor for the share of the lands which fell to him on partition ; and the mortgages, so far as they respected the other shares, were a mere secuity. *Akin*, therefore, stood on the mortgages as a surety for the debts of *Goodman* and *Dickinson*.   As to the latter individual, Akin was most clearly discharged by the substitution of *Jones*' security, and the delivering up of Dickinson's bonds to be cancelled ; and the trustees, with their assignee Boudinott, had tampered so much with the bonds of Goodman, that I think we ought to hesitate long before we hold that Akin's land should be charged for his debt.

But aside from these and various other considerations in the case, it is I think clear, that the *release of Bayard* should, under the circumstances, be allowed its full operation both as to him and his co-trustee.   Certainly this would not have been so, had its operation depended entirely on the hand and seal of Bayard.   Technically, all the trustees must join in releasing a security ; and I think that in legal effect they have joined in executing the release to Akin. That paper was originally drawn for both to execute ; Mr. Van Rensselaer's name was inserted in the body ; and in addition to the name and seal of Bayard a space was left for the name of Mr. Van Rensselaer with a seal affixed. So long as Mr. Van Rensselaer kept the control of the mortgages in his own hands, he withheld his assent, and refused to execute.   But by joining Bayard in an absolute assignment of the mortgages to Boudinott, he parted with

Van Rensselaer v. Akin.

that control, which passed to his assignee. The latter filed a bill of foreclosure and proceeded to a sale. In that proceeding, the name of Akin, and his share of the land, are dropped; and looking at the entire progress of the suit, in connection with other facts, the validity of the release is as plainly recognized, as if it had been recited and expressly confirmed. We are told in so many words by Boudinot that he went on to sell and did sell all the land covered by the mortgages except such as had been previously released; and by omitting the land of Akin, he says that had been released. As the holder and owner of the mortgage for the time being he possessed the power to make that declaration—to speak for Mr. Van Rensselaer, who had conferred it. It was the same, in legal effect, as if Mr. Van Rensselaer had himself filed the bill, and taken up and pursued the same course of procedure. That would have been a confirmation of Bayard's release; and this is equally so. It is not necessary to say that the omission of *Akin* and his land was of itself admissible in evidence against the appellants, although they profess to claim under Boudinot. I know that a chancery bill in its assertions and omissions, partakes so much of the surmises of counsel, that the courts are unwilling, as a general rule, to receive it in evidence against the client, or those claiming under him. But in the case at bar, we have the personal action of Mr. Boudinot. Under this bill, and the report and master's sale, all speaking the same language he becomes a purchaser, systematically overlooking Akin, and treating his land as exempt from the mortgage, in virtue of a release. What release? There was none except that of Bayard. Boudinot was as much concluded, in equity, as if he had taked the release into his hand and personally delivered it to Akin. In *Smith* v. *Low*, 1 *Atk.* 489, the mother of several infant devisees, assuming to have authority as guardian, demised their land by a building lease for 41 years. Of course the infants did not and could not execute the lease; but they acted upon it, by receiving rent, after they came of age; and Lord *Hardwicke* established the lease in equity; thus

Van Rensselaer v. Akin.

declaring that such acquiescence was equivalent to an original delivery. See also *Sadler* v. *Robinson's heirs,* 2 *Stew. Ala. R.* 520. The case of *Nelson* v. *Carrington,* 4 *Munf.* 332, 341, will be found still more circumstantially in point.

I have said so much, with the view, among other things, to prevent the supposition that I mean to rely on the omissions in the bill filed by Boudinot, as evidence against him when taken by themselves. I am noticing the line of conduct which he pursued in his foreclosure cause, in which I do claim that we have a right to look at the omissions as one circumstance in connection with others. Authorities were cited on the argument to show that the proceedings in that cause cannot be received under the notion of *transit in rem judicatam.* That I do not mean to deny, although I do not think the chancellor at all extravagant in suggesting the contrary. If a man holding an entire lien in his hands will split or cut it down, by foreclosing as to a part only, he should be barred for the whole. I will not stop to inquire whether that objection applies;- for it is perfectly well settled, that judicial proceedings may be given in evidence like any thing else, as circumstances from which to infer a given consequence, without that concurrence as to identity of parties and subject matter which works a technical bar. The general principle was, I think, involved in *Peters* v. *Anderson,* 5 *Taunt.* 596, where the record in one suit against the defendant was received as a circumstance to show that the plaintiff had appropriated certain payments made by the defendant to another demand against him. The inference was derived from the fact, that in the course of the proceedings given in evidence, and which had been referred, he had omitted to credit the payment. A man is entitled to revoke a deed of property, and a judgment in a suit brought by him may be evidence, *inter alios,* as an expression of his intention to revoke. *Dismukes* v. *Musgrove,* 8 *Mart. Lou. R. (N. S.)* 375 ; and see *Witmer* v. *Schlatter;* 2 *Rawle's R.* 359, 366, *per Huston, J.; Leeds* v. *Leeds,* 12 *Conn. R.* 176, 179, 180. A prisoner escapes from execution, both while he is in the custody of the old and the new sheriff; the plaintiff may elect which sheriff he will sue.

Van Rensselaer v. Akin.

But if he go against the former, and recover judgment, the record is evidence in favor of the latter not that the case of the latter has passed in judgment, but as a circumstance to show the plaintiff's election, that he will look exclusively to the former. Here both parties and subject matter are different, and yet, in *Rawson* v. *Turner*, 4 *Johns. R.* 469, the former suit was holden conclusive. In *Kemper* v. *Turner*, 2 *Miller's Lou. R.* 149, 150, the defendant was sued for money which he had collected as attorney for the plaintiff. The now defendant had formerly sued the plaintiff's brother, in which suit he had credited him with the money now in question; and the now plaintiff had acquiesced in that credit. The first suit and acquiescence were received in evidence as a bar. There is a case in the *Kentucky* reports still more pertinent. The question was whether an alleged agent had acted within the scope of his authority in making a deed. Some of the parties now disputing the agency, had, while infants, filed a bill in chancery by their guardian, which contained a recognition of the agent's authority; and this bill was received in evidence against them; not, says *Owsley*, J. " as a fact, if it stood alone, that would be entitled to any extraordinary weight, but as a circumstance calculated to strengthen the presumption raised by various other facts, that in making the deed the agent acted strictly within the scope of his authority ; and, for that purpose, the bill was properly used in evidence." So, in the case at bar, the omissions in the bill of Boudinot may be received in connection with his other acts in the same cause, which cannot be accounted for on any hypothesis, other than that he intended the release of Bayard should take effect. Who was Bayard ? He was the sole acting trustee. To him, Akin had paid his entire debt, or nearly the whole. Other considerable payments had been made on Goodman and Dickinson's bonds. Van Rensselaer himself knew from the begining that the purchase had been made with a view to retail the land ; that the purchasers looked to the avails as constituting a great part of their ability to pay. They could not sell without releases, and many were given in which Van Rensselaer joined, on the very princi-

ple which led Bayard to execute the release now in question. In this, it is true, he refuses to join; but he transfers his authority to Boudinot, and the latter, as it is very natural he should, acts in the spirit of the original understanding, by treating the release as valid. I will not say that a contrary course would have been wanting in legal good faith. Perhaps the understanding, not having been reduced to writing, was void. But still, the consideration of morals and honor is in the case, and leads the mind more willingly to suppose that Boudinot meant what his course of conduct in the suit appears so strongly to indicate. The whole is, to my mind, about equivalent to an answer in chancery, which, though in another suit, may be treated as a sworn confession of the party. Then, clogged with this evidence, the title comes back to these appellants. They themselves give in evidence a conveyance from Boudinot's representatives. They must succeed through a title derived from him, if they succeed at all. They come as privies. They claim under him, and must be bound by his acts. All that he has said and done and omitted in relation to the release of Bayard, are imputable to the appellants as their sayings and their acts. In *Lady Dartmouth* v. *Roberts*, 16 *East*, 344, the defendant claimed to have derived his title from one Leathley, who had answered in chancery at the suit of another, to a fact materially affecting his title. Lord *Ellenborough* said : "It appears to me this was not *res inter alios acta*, but *inter eosdem acta ;* and was not only evidence, but strong evidence against the defendant, who stood in the same place by derivation of title and by legal obligation, as Leathley."

I do not forget that the force of this reasoning was sought to be broken by several considerations. One was, that Boudinot was a mere pledgee, having but a limited authority—not authority which would enable him to validate the release; another, that the whole transaction with him was usurious and void. Several answers might be given to these and the like objections raised in the course of the argument, but the one already in part noticed is sufficient for all. The appellants, by claiming under and taking title

from Boudinot, shall not be received, at this day, to say that his title was void. Their own act has made it good. Even if it were void for usury, they have chosen, instead of re-voking it for that reason, to allow the usurer his course. He obtained a title on foreclosure and sale, admitting at every step of the proceeding that he had not foreclosed *Akin,* because he held a valid release. Boudinot made pur-chases at the master's sale of most of the land, which the appellants now say in their bill he conveyed to Mr. Van Rensselaer, the very trustee who refused originally to exe-cute the release. After that, the appellants, the *cestuis que trust,* took an assignment of the mortgages from Boudinot's devisees in trust, evidently with a view to this suit, for the bill was filed within a few days after. It is too late now to question the power of Boudinot to release Akin, if the right to question it ever existed.

But there is another feature in this case which ought not to be passed without notice. After the assignment to Bou-dinot and his foreclosure and sale, we find the *cestuis que trust,* these very appellants, filing their bill against Bayard and Stephen Van Rensselaer, in which they charged Bay-ard alone, not Van Rensselaer, with having improvidently released land from the lien of the mortgages in question; and they pursued him and compelled him to account on that assumption. The same proceedings also recognize the assignment to Boudinot as a valid one. But, what is more material, looking at the course of that suit, I think it ac-knowledges a general agency in Bayard to execute releases in respect to the Greenbush property. At least it manifests an election by these appellants to consider such releases as valid, and charge Bayard with the consequent loss, instead of disavowing his authority, and enforcing the mortgage or mortgages on the land released. Of such general agency or election, *Akin* has a right to avail himself; and I think that, on the principle established by the cases already cited, he may invoke the chancery suit of the appellants as evi-dence against them, although he was not a party to that suit. I do not mean to say that the bill was evidence in the same sense that we receive an answer, even if it had

been sworn to by all the appellants. It was in fact attested by only one of them. But a bill is always receivable as a part of the whole proceedings, to explain the nature and object of the suit, where that is material and relevant. It was here used in connection with the ulterior proceedings, in order to raise a defence upon Bayard's release, by shewing either that he was a general agent, or that the appellants intended to confirm his act. It was said of like evidence by a learned judge, " although these records were not directly between the plaintiff and defendant, yet they were a part of the *res gestæ* out of which the present action has grown. They were circumstances from which the jury might properly deduce facts ; and the court very properly permitted them to go to the jury." Nicholson, J. in *Michael* v. *Wells, Walker's R.* 353, 354, 355. The bill brought by these appellants was a part of the *res gestæ,* from which, I think, taken in connection with Bayard's release, a complete defence has accrued to Akin. The decree of the court of chancery should be affirmed.

The decree was *unanimously* AFFIRMED.